UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TODD J. MCNALLY,**

      **Plaintiff,**

**v.**                              **CASE NO. 8:06-CV-2310-T-23EAJ**

**MARK EVE, individually, and**
**WILLIAM BALKWILL, as Sheriff**
**of Sarasota County, Florida,**

      **Defendants.**

_____/

## ORDER

Before the court are **Plaintiff's Motion for Summary Judgment** (Dkt. 24), **Defendants'**

**Motion for Summary Judgment** (Dkt. 25), and the parties' responses (Dkts. 26, 27).[1]

Plaintiff Todd McNally ("McNally") sues Deputy Mark Eve ("Eve") and William Balkwill,

Sheriff of Sarasota County, Florida ("the Sheriff") for unreasonable seizure and excessive force in

violation of civil rights enforceable under 42 U.S.C. § 1983 ("Section 1983"). Upon consideration,

Plaintiff's motion is denied and Defendants' motion is granted in part and denied in part.

**I.**      **Background**[2]

On the evening of July 2, 2006, Eve received a call from the Sheriff's dispatcher to respond

to a complaint about loud music. He drove to the complainant's address, where he spoke with

several people who were fishing by the waterside and had heard the music.  After determining that

the music originated from a house across the intercoastal waterway, Eve proceeded to that location

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge
on April 30, 2008 (Dkt. 42).

[2] The background facts are record undisputed facts unless otherwise stated.

to investigate.

Starting that afternoon and continuing into the evening, McNally had been hosting a Fourth of July party for thirty to forty-five guests at his residence. (McNally Dep. 23:25-24:17, June 27, 2007)[3]  Most of the partygoers had been drinking alcohol and most were likely under the influence of alcohol. (McNally Dep. 34:6-14)

Arriving at the residence at dusk (some daylight remained), Eve parked his patrol car and walked in the direction of the music, noticing "quite a few" cars parked outside the house.  (Eve Dep. 55:3-7, June 27, 2007)[4] As he approached the residence, Eve encountered a woman sitting on the front steps who appeared intoxicated. Eve asked to speak with the homeowner.  Following the woman up the steps, Eve stopped at the front door where he observed a party inside the house. (Eve Dep. 57:5-19)

The woman located McNally in a hot tub and told him of the deputy's presence and request to speak with him.  McNally soon appeared on the front porch, wearing a bathing suit with a towel wrapped around his waist.[5]  Detecting the smell of alcohol from McNally, Eve told McNally about the noise complaint and instructed him to turn off the music.   (Eve Dep. 59:5-15; 65:19-25) McNally answered that he was having a Fourth of July party.  Eve then told McNally that he could set up a sobriety checkpoint to stop McNally's partygoers if McNally failed to turn down the

---

[3] Hereinafter cited as "McNally Dep."

[4] Hereinafter cited as "Eve Dep."

[5] The parties present conflicting evidence on whether McNally told Deputy Eve his name or otherwise identified himself as the homeowner at this time.  However, this fact is immaterial to either of McNally's claims.

volume. (Eve Dep. 61:4-19) After this exchange,[6] Eve directed McNally to walk down the steps with him to the front of the house to continue their conversation. McNally complied. Once on ground level in front of the steps (and with about five or six partygoers gathered at the top of the stairs who observed the exchange), Eve and McNally continued the conversation.

The record account of McNally's and Eve's factual recollections from that point on diverge sharply. According to McNally, Eve asked McNally for his name, date of birth, and home address. McNally promptly provided the requested information and turned to walk up the steps. By this time, someone had turned off the music (or at least turned it down). McNally had ascended only one step when he saw his friends' facial expressions change. He turned around to face Eve, who was aiming his taser gun at McNally.[7] When McNally stepped down off the step, Eve tasered McNally in the chest, causing McNally to collapse. Eve then tasered McNally "at least two times" in the back before handcuffing McNally, arresting him for obstruction, and escorting him to jail in the back of Eve's patrol car. (Amend. Compl. ¶ 15; McNally Dep. 35:4-36:13; 41:9-11; 42:23-43:3; 45:19-46:15)

In direct contrast, Eve describes McNally as loud and argumentative during the ground-level

---

[6] Record evidence presents conflicting accounts of Deputy Eve's demeanor during the initial exchange on the porch. McNally testified that Deputy Eve "basically blew up on [him]" and ordered him to "get to the bottom of the stairs." (McNally Dep. 35:10-14; 37:5-17) But contrary evidence from an eyewitness suggests that both men remained calm during this exchange. (Thacker Dep. 34:5-35:13; 37:8-18; 46:17-24, Nov. 29, 2007) (hereinafter cited as "Thacker Dep.")

[7] A taser gun "is a Conducted Energy Weapon that uses propelled wire to conduct energy to a remote target, thereby controlling and overriding the body's central nervous system. The taser gun fires two probes up to a distance of twenty-one feet from a replaceable cartridge. These probes are connected to the taser gun by high-voltage insulated wire. When the probes make contact with the target, the taser gun transmits electrical pulses along the wires and into the body of the target." Draper v. Reynolds, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004).

exchange, refusing to give Eve the requested information (except Eve concedes that McNally told Eve his name). (Eve Dep. 74:16-20) When McNally turned to ascend the steps, Eve (with his hands in front of him) stepped in front of McNally to prevent him from leaving. Eve again asked McNally for his address and date of birth and told McNally that if he failed to provide the information, Eve would arrest him. (Eve Dep. 74:2-18; 78:4-20; 79:23-80:10; 81:11-18)

When McNally failed to comply and turned to walk away, Eve called for backup units to assist. (Eve Dep. 108:18-119:19) Eve then told McNally that he was under arrest for obstruction and ordered him to put his hands on a nearby car. Eve claims that McNally then assumed a "fighting stance," clinched his fists with both hands down by his sides, and "squared off" facing Eve. (Eve Dep. 82:18-24; 86:24-87:12) Eve unholstered his taser, aimed it at McNally, and again ordered McNally to put his hands on a car. Eve then tasered McNally in the chest, causing him to fall to the ground. Eve claims he deployed the taser a second time only because McNally failed to comply with Eve's order to remain on the ground and to place his hands behind his back. (Eve Dep. 92:22-94:14) Eve denies deploying the taser a third time.

The State Attorney's Office declined to file criminal charges against McNally.

McNally claims in his complaint that because of the arrest and the tasering, he suffered ant bites on his face and neck; physical, mental, and emotional pain and discomfort; embarrassment, professional humiliation, fear, anxiety, apprehension, sleeplessness, public scorn, ridicule, and a generally diminished sense of personal and family safety; and monetary damages because of attorney and investigative fees incurred to defend against criminal prosecution (as well as the costs of bringing the instant suit). (Amend. Compl. ¶¶ 16, 29) Specifically, McNally testified that he suffered pain from the taser's prongs striking his bare skin and causing "two deep little holes" in his

4

chest.  McNally also claims that he experiences continuing and unusual heart pain that he never felt before the arrest.  However, McNally has seen no physician since his arrest.  (McNally Dep. 47:8-49:22; 62:7-64:19; 65:22-24)

## II.   **Legal Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the movant has met this burden, the nonmoving party must identify specific facts that raise a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

"A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992)). In considering a summary judgment motion, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

The court must judge all evidence in the light most favorable to the nonmoving party and must draw all justifiable inferences in the nonmoving party's favor. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990) (citations omitted). However, the evidence must also be viewed in light of the evidentiary burden of the respective parties under the substantive law of

the case. Id. (citing Anderson, 477 U.S. at 248). If a reasonable jury could find for the nonmoving party, summary judgment is inappropriate. Id. (citing Celotex, 477 U.S. at 324).

## III.   Discussion

Because Section 1983 grants no substantive right but provides only "a method for vindicating federal rights elsewhere conferred," a Section 1983 claim requires the deprivation of a specific federal right. Albright v. Oliver, 510 U.S. 266, 271 (1994). The Fourth Amendment's protection against unreasonable seizure guards against an arrest without probable cause and the use of excessive force during an arrest. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (citation omitted). Arguing that he is entitled to summary judgment, McNally claims that the record evidence proves Eve violated the Fourth Amendment by arresting him without probable cause. McNally also claims that Eve's use of the taser constituted excessive force under the circumstances. Defendants respond that summary judgment in their favor is proper because Eve is entitled to qualified immunity and the undisputed facts show that no policy or custom of the Sheriff caused McNally's alleged injury.

### A.   Qualified Immunity as to Defendant Eve

Qualified immunity permits a government official to perform a discretionary duty "without the fear of personal liability or harassing litigation" and protects from suit "all but the plainly incompetent." Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (internal quotation marks and citation omitted). Qualified immunity protects only those government officials acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citations omitted). No party disputes that Eve was acting within the scope of his discretionary authority as a Sheriff's deputy.

Evaluating a qualified immunity defense requires a two-part inquiry. First, the court must ascertain whether the plaintiff's allegations, if accepted as true, establish a specific constitutional violation. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)[8]; <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137 (11th Cir. 2007). Second, if the plaintiff's version of the facts establishes a constitutional violation, the court must then determine whether the violation abridged a constitutional right "clearly established" by then existing legal precedent. <u>Saucier</u>, 533 U.S. at 201; <u>Skop</u>, 485 F.3d at 1137.

## 1.   Constitutional Violation

The court must apply the <u>Saucier</u> inquiry to each of McNally's claims for unreasonable seizure and excessive force independently. <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1197 (11th Cir. 2002). In analyzing whether qualified immunity applies, the court must view the facts in the light most favorable to McNally, the allegedly injured party. The Eleventh Circuit has clearly stated:

> When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury. When a district court considers the record in this light, it eliminates all issues of fact. By approaching the record in this way, the court has the plaintiff's best case before it. With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute. Thus . . . material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity.

<u>Robinson v. Arrugueta</u>, 415 F.3d 1252, 1257 (11th Cir. 2005) (citation omitted). Thus, in applying the <u>Saucier</u> analysis, the court accepts McNally's factual account of the July 2, 2006 events as true.

---

[8] On March 24, 2008, the United States Supreme Court granted the petition for a writ of certiorari in <u>Callahan v. Millard County</u>, 494 F.3d 891 (10th Cir. 2007), <u>cert. granted</u>, <u>Pearson v. Callahan</u>, ___ S. Ct. ___, 76 U.S.L.W. 3316, 2008 WL 754340, *1 (U.S. Mar. 24, 2008) (No. 07-751). In addition to the Fourth Amendment questions presented by the petition, the Court directed the parties to brief and argue the following question: "Whether the Court's decision in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) should be overruled?" Notwithstanding, <u>Saucier</u> remains controlling authority in analyzing Eve's qualified immunity defense in the instant case.

### a.   <u>Unreasonable Seizure</u>

The first prong of the <u>Saucier</u> inquiry requires the court to determine whether Eve violated McNally's Fourth Amendment constitutional right against unreasonable seizure.  Eve argues that he had probable cause to arrest McNally for either a violation of the noise ordinance or obstruction. "[A]n arrest is a seizure of the person . . . and the 'reasonableness' of an arrest is . . . determined by the presence or absence of probable cause for the arrest."  <u>Skop</u>, 485 F.3d at 1137 (internal citation omitted).  However, arguable probable cause is "all that is required for qualified immunity to be applicable to an arresting officer."  <u>Lee</u>, 284 F.3d at 1195 (citations omitted).  Arguable probable cause exists if "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest." <u>Skop</u>, 485 F.3d at 1137 (emphasis in original, internal quotation marks and citation omitted).  Thus, if Eve had "arguable probable cause" to arrest McNally for either a noise ordinance violation or obstruction, no unreasonable seizure occurred.

No party disputes that the Sheriff's office dispatched Eve that evening to respond to a complaint about loud music. The Sarasota County noise ordinance prohibits:

> The using, operating, or permitting to be used or operated, any radio, television, tape or record player, amplifier, musical instrument or other machine or device used for the production, reproduction or emission of sound in such a manner as to disturb the peace, quiet and comfort of the neighboring inhabitants or with greater intensity than is necessary for convenient hearing for the Person or Persons who are in the room, vehicle or chamber in which said sound emitters are operated and who are voluntary listeners thereto.

Sarasota County Code Ordin. (Fla.) § 54-153(b)(2) (current through Sept. 2007) (Dkt. 24, Ex. B) (hereinafter "the noise ordinance").  The noise ordinance provides that a law enforcement officer "shall issue a warning to the Person or Persons responsible for the noise" when the officer "has

probable cause to believe that a violation . . . has occurred." Id. at § 54-154(a).  The warning "shall advise the Person or Persons of the violation . . . and specify a reasonable time to comply," which the ordinance defines as fifteen minutes absent special circumstances. Id. at § 54-154(a), (b). If the noise violation remains after a reasonable time or if the violation recurs within ninety days, the noise ordinance authorizes the offender's arrest.  If convicted, the offender is subject to a fine, imprisonment, or both.  Id. at § 54-154(c).

Eve submits that he had probable cause to arrest McNally for violating the noise ordinance in Eve's presence.  Notwithstanding the ordinance's mandatory "cooling off period" before authorizing an offender's arrest, Section 901.15(1), Florida Statutes ("Section 901.15(1)") permits a law enforcement officer to arrest a person without a warrant if the person has violated a municipal or county ordinance in the officer's presence.  Fla. Stat. § 901.15(1) (2007).  The statute authorizes the officer to arrest the ordinance violator only "immediately or in fresh pursuit." Id.  Because "[m]unicipal ordinances are inferior to laws of the state and must not conflict with any controlling provision of a statute," Thomas v. State, 614 So. 2d 468, 470 (Fla. 2003), Section 901.15(1) permitted Eve to arrest McNally if Eve had arguable probable cause to believe that McNally violated the noise ordinance in Eve's presence.

Accepting McNally's factual account as true, the court finds that Eve had arguable probable cause to believe that McNally violated the noise ordinance in Eve's presence.  Eve testified (and McNally does not dispute) that, before arriving at McNally's home, Eve heard music originating from across the intercoastal waterway.  Eve arrived at McNally's street by following the direction of the music.  After parking his patrol car, Eve walked in the direction of the noise, which led him to McNally's residence.  Eve heard loud music while standing on McNally's porch to wait for the

homeowner.  When McNally appeared and identified himself, Eve told McNally to turn off the music.  Without contradiction, Eve testified that before he and McNally left the front porch, Eve believed that McNally was in violation of the noise ordinance. (Eve Dep. 62:5-22)

Although he submits evidence that someone turned off the music (or at least turned it down) at some time during his exchange with Eve,[9] McNally presents no evidence that raises a genuine question as to whether there was arguable probable cause for his arrest.  Based on the undisputed record facts, a reasonable officer in the same circumstances and possessing the same knowledge as Eve could have believed that McNally was violating the noise ordinance.

But even if Eve had arguable probable cause to believe that McNally violated the noise ordinance in Eve's presence, the closer question is whether Eve had the authority to effectuate a full custodial arrest under the circumstances.  In Thomas, the Florida Supreme Court clarified that the term "arrest" as used in Section 901.15(1) "does not necessarily mean a full custodial arrest and incident search."  614 So. 2d at 471.  Rather, "the term 'arrest' as it relates to violation of a municipal ordinance can be construed as meaning to detain for the purpose of issuing a ticket, a summons or a notice to appear." Id. at 470-71 (internal quotation marks and citation omitted). A full custodial arrest is unreasonable and violates the Fourth Amendment "when a person is charged with violating a municipal ordinance regulating conduct that is noncriminal in nature." Id. at 471.  If the offender violates a noncriminal ordinance in an officer's presence, Section  901.15(1) permits an "arrest" only for the limited purpose of issuing a ticket, summons, or notice to appear. Id. Thus, whether Eve was entitled to effectuate a full custodial arrest hinges on whether the Sarasota County noise ordinance is "noncriminal in nature." Id.  The court finds instructive the Eleventh Circuit's

---

[9] McNally Dep. 42:23-43:8; Thacker Dep. 47:15-22.

opinion in <u>Lee v. Ferraro</u>.[10]

In <u>Lee</u>, the Eleventh Circuit reversed the district court's denial of qualified immunity to a City of Miami police officer against a claim for unlawful arrest, finding that the officer had probable cause to arrest the plaintiff for improperly honking her car horn in violation of a Miami-Dade County noise ordinance. 284 F.3d at 1195. Although Lee argued that Florida law prohibited a full custodial arrest for a violation of a noncriminal local law (such as a traffic ordinance), the Eleventh Circuit determined that the ordinance at issue was clearly a criminal law due to the possible penalty of sixty-days imprisonment for a violation. <u>Id.</u> at 1196. The mere "*prospect of incarceration* plainly [made] violating the . . . ordinance a crime." <u>Id.</u> (emphasis added, citing Section 125.69(1), Florida Statutes ("stating that violations of county ordinances carrying possible jail sentences 'shall be prosecuted in the same manner as misdemeanors are prosecuted'").

Like the ordinance at issue in <u>Lee</u>, Sarasota County's noise ordinance includes the "prospect of incarceration."[11]  Because the noise ordinance establishes a possible penalty of sixty-days imprisonment, it qualifies as a criminal law under <u>Lee</u>. Accordingly, an officer who reasonably believes that a violation of the Sarasota County noise ordinance is occurring in his presence is allowed to effectuate a full custodial arrest under Section 901.15(1).[12] An officer may arrest an

---

[10] 284 F.3d 1188.

[11] Sarasota County Code Ordin. § 54-154(c).

[12] The noise ordinance does not contemplate the penalty of incarceration until the offender has been given a "reasonable time" to comply. Unless otherwise specified, a "reasonable time" is fifteen minutes. Sarasota County Ordin. § 54-154(a), (b). Thus, it is possible to construe the ordinance as a noncriminal infraction unless an offender fails to comply after a reasonable time, at which point the ordinance becomes a criminal law because of the possible penalty of incarceration. Under that reasoning, the ordinance could be construed as precluding Eve from effectuating a full custodial arrest because he failed to allow McNally a reasonable time to comply. (Eve Dep. 64:2-10) However, the <u>Lee</u> court did not distinguish ordinances that appear both noncriminal and criminal

individual without violating the Fourth Amendment "[if the] officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). Thus, McNally's arrest was lawful and his Fourth Amendment claim against Eve for unreasonable seizure fails.[13]

### b. Excessive Force

Although Deputy Eve is entitled to summary judgment on McNally's unreasonable seizure claim, the court must independently analyze McNally's excessive force claim under Saucier. Lee, 284 F.3d at 1197. The Fourth Amendment protects against the use of excessive force during arrest. Crosby, 394 F.3d at 1333 (citation omitted). Consistent with the Fourth Amendment, law enforcement officers are entitled to use reasonable force to execute a lawful arrest. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the

---

in nature but held that merely the *prospect* of incarceration makes an ordinance a criminal law. 284 F.3d at 1196 (emphasis added). Thus, following Lee's reasoning, the entire ordinance qualifies as a criminal law.

But even if McNally had advanced this argument (which he did not), the court finds that a deputy in Eve's position could have reasonably believed that a full custodial arrest was permitted under the circumstances because arguable probable cause to arrest existed. Cf. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (citation omitted) ("Even law enforcement officers who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.").

[13] Because Eve had arguable probable cause to arrest McNally for violating the noise ordinance, the court need not address whether Eve's other proffered basis for probable cause, obstruction in violation of Section 843.02, Florida Statutes, provided an additional basis for arguable probable cause. Durruthy v. Pastor, 351 F.3d 1080, 1090 n.7 (11th Cir. 2003).

Further, the fact that Deputy Eve arrested McNally for obstruction instead of for violating the noise ordinance is immaterial to the qualified immunity analysis. The law of this circuit provides that "the validity of the arrest does not turn on the offense announced by the officer at the time of the arrest." Lee, 284 F.3d at 1195-96; Durruthy, 351 F.3d at 1090 n.6 (officer shielded by qualified immunity if he or she had probable cause to arrest for any offense). Thus, if Eve had arguable probable cause to arrest McNally for any offense, Eve is entitled to qualified immunity.

Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396-97 (1989) (holding that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it").

"The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) (citations omitted). This "calculus of reasonableness" must allow "for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. The determination of whether an officer's use of force was reasonable requires examination of: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 396.[14]

Accepting McNally's factual account as true, Eve's use of the taser — not once, but three times[15] — weighs in McNally's favor under Graham. McNally's crime of violating the noise

---

[14] See also Draper, 369 F.3d at 1278 (stating that "in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted") (internal quotation marks and citations omitted).

[15] For summary judgment purposes, the court must accept McNally's account that Eve fired the taser three times. Although Defendants' expert, Captain David A. Ogden of the Orange County Sheriff's Office, concludes in his report entitled *Independent Review and Report on Use of Force Incident* that Eve fired the taser only twice, Captain Ogden arrives at that conclusion by accepting Eve's testimony as true (Dkt. 25, Attach. 9). In Stephens v. City of Butler, Ala., 509 F. Supp. 2d 1098, 1104 (S.D. Ala. 2007), the court found that the officer had fired his taser four times because the taser included a readout indicating that the officer had pulled the trigger four times. Here, nothing in the record (such as a readout) conclusively establishes how many times Eve fired the taser.

ordinance (or even the possible crime of obstruction as articulated by Eve) was of minor severity. "Generally, more force is appropriate for a more serious offense and less force is appropriate for a less serious one." <u>Vinyard</u>, 311 F.3d at 1347 (citations omitted).

Likewise, construing the facts in the light most favorable to him, McNally posed no threat to Eve nor to the safety of others. (Shamron Mitchell Dep. 44:4-15, Sept. 28, 2007)[16]  Indeed, McNally testified that he remained calm during the entire exchange and calmly tried to walk away from Eve.  (McNally Dep. 35:10-36:8; Thacker Dep. 68:8-20)  Eve testified about his concern that McNally was "clearly more muscular and strong than [Eve]," but other evidence demonstrates that eyewitnesses were concerned for McNally's safety. (Eve Dep. 100:16-23; McNally Dep. 36:2-13) Further, although Eve had not yet handcuffed McNally before  tasering him, Eve could not have reasonably believed that McNally had any concealed weapons on his person — McNally was bare-chested, wet from the hot tub, and dressed only in a bathing suit with a towel wrapped around his waist.

Finally, the evidence, viewed in the light most favorable to Plaintiff, demonstrates that McNally never resisted arrest or attempted to flee at any time.  McNally did not hear Deputy Eve announce that McNally was under arrest. (McNally Dep. 40:16-25; 41:17-19; Mitchell Dep. 45:24-46:4; Thacker Dep. 50:5-7) By turning to walk up the steps, McNally was not attempting to flee from the scene but rather to return to his house after providing Eve all of the requested information. Although "[t]he Fourth Amendment permits increased force when a subject is attempting to run away and thereby evade capture," that situation did not exist here. See <u>Casey v. City of Federal Heights</u>, 509 F.3d 1278, 1282 (10th Cir. 2007).  When Eve deployed the taser a second time,

---

[16] Hereinafter cited as "Mitchell Dep."

McNally was face down on the ground and attempting to recover from the impact of the first tasering. (Mitchell Dep. 47:20-23; Thacker Dep. 41:20-23)  At this time, McNally "clearly posed no threat at all to the officer or to anyone else and no risk of flight." Lee, 284 F.3d at 1198.

Based on McNally's evidentiary account, a trier of fact could conclude that Eve's conduct was not objectively reasonable under the circumstances.  Thus, the court cannot find, on the summary judgment motion, that "a reasonable officer would believe that this level of force [was] necessary in the situation at hand." Lee, 284 F.3d at 1197 (internal quotation marks and citation omitted).  Although "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense," if the trier of fact were to believe McNally's factual account, Eve's use of the taser could be found to constitute unreasonable and excessive force under the circumstances. Durruthy, 351 F.3d at 1094.  Under Saucier, McNally has sufficiently demonstrated excessive force in violation of the Fourth Amendment for the purpose of defeating summary judgment.

## 2.      **Clearly Established Right**

Because McNally has adequately demonstrated excessive force to overcome the qualified immunity defense at this stage, the court must evaluate whether McNally's constitutional right was "clearly established" at the time of the violation. Vinyard, 311 F.3d at 1349. "For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Bates v. Harvey, ___ F.3d___, No. 07-10570, 2008 WL 565774, *13 (11th Cir. Mar. 4, 2008) (internal quotation marks and citation omitted). "A plaintiff need not show that the officer's conduct specifically has been held unlawful. Rather, to avoid having [his] suit barred by qualified immunity, a plaintiff need only show that in

15

the light of pre-existing law the unlawfulness [was] apparent." Id.  "Thus, the salient question . . . is whether the state of the law at the time the officer[] acted gave [him] fair warning that [his] conduct was unconstitutional." Id. (citation omitted).  Applying this standard to the instant case, a reasonable officer must have known that he could not behave as McNally alleges that Eve did. See Casey, 509 F.3d at 1284.

The law provides an officer "fair and clear notice" that his conduct is unconstitutional in three ways.  First, the case may be one of "obvious clarity" — the officer's conduct will "lie[] so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law" on point. Vinyard, 311 F.3d at 1350 (citations omitted).  Second, "where the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face," the court turns to case law to look for a broad statement of principle that a particular type of conduct was unconstitutional (without linking that conduct to a specific set of facts).[17]  Id. at 1351.  And finally, in the absence of case law determining that a particular type of conduct was unconstitutional, the court looks at precedent that is tied to the facts. Id.

McNally points to no "materially similar case" that existed as of July 2, 2006 that is instructive on the factual situation presented here.  However, in the Eleventh Circuit, an officer's "use of a taser is not alone evidence of excessive force."  Ainsworth v. Inabinett, No. 2:05-CV-740DRB, 2006 WL 2709850, *6 (M.D. Ala. Sept. 20, 2006) (citation omitted).  In Draper v.

---

[17] In evaluating the qualified immunity defense, "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state . . . can clearly establish the law." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

Reynolds, the Eleventh Circuit held that the use of a taser in effectuating an arrest is constitutional if the amount of force deployed is reasonably proportionate to the need for force under the totality of the circumstances.  369 F.3d at 1278.  Draper, a tractor trailer truck driver stopped by a sheriff's deputy for an improperly illuminated tag light, became increasingly loud, profane, and hostile to the officer, complaining of mistreatment and angrily refusing the officer's repeated requests for certain documents.  After asking Draper for the documents a fifth time, the officer tasered Draper in the chest without warning.  Draper fell to the ground, and the officer "threatened to discharge the taser gun again if Draper did not comply." 369 F.3d at 1273.  On these facts, the court held, in pertinent part:

> Reynolds' use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force.  From the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative. No less than five times, Reynolds asked Draper to retrieve documents from the truck cab, and each time Draper refused to comply. . . .  More importantly, a verbal arrest command accompanied by attempted physical handcuffing, may well have . . . escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt.  Thus, there was a reasonable need for some use of force in this arrest. Although being struck by a taser is an unpleasant experience, the amount of force Reynolds used — a single use of the taser gun causing a one-time shocking — was reasonably proportionate to the need for force and did not inflict any serious injury.

Id. at 1278.

Unlike the evidence in the instant case, the evidence in Draper clearly showed that Draper and the officer were engaging in a verbal altercation (on the side of a busy road) that had escalated such that Draper was yelling at the officer and repeatedly refusing to comply with the officer's requests. Id. at 1272.  Here, under his version of the facts, McNally remained calm during the conversation and provided Eve with all of the information requested the first time Eve asked for it

17

(even though Eve never told McNally that he was in violation of the noise ordinance or explained why he needed McNally's information). McNally never verbally (or physically) threatened Eve and never took a step toward Eve — to the contrary, McNally's evidence shows that he tried to walk only away from Eve. Eve never warned McNally that Eve may use the taser if McNally failed to place his hands on a car. (Eve Dep. at 91:19-92:25; Thacker Dep. 50:5-7) Indeed, according to McNally, Eve never said anything to McNally immediately before using the taser a first, second, or third time. (McNally Dep. at 40:16-25; 46:9-15)

Eve argues that, like the officer in <u>Draper</u>, he was trying to avoid the escalation of a difficult situation by using the taser rather than engaging in a physical confrontation with McNally to effectuate the arrest. Eve contends that he was concerned for the safety of himself and others because he was the lone law enforcement officer in the midst of a large group of people, most of whom had been consuming alcohol. However, Eve concedes that he had called for back-up assistance before allegedly announcing to McNally that he was under arrest. Assuming, as McNally claims, that he provided Eve with all of the requested information in a polite and respectful manner and then calmly turned to walk away from Eve, no reason existed at that time for Eve to believe that the situation was escalating such that either he or McNally could be hurt in a physical confrontation. Indeed, the evidence shows that the onlookers remained silent until after Eve tasered McNally. (Thacker Dep. 42:9-21) To accept that Eve used the taser to avoid the escalation of a tense and difficult situation would be to make a credibility determination in Eve's favor, which the court cannot do at this stage.[18]

---

[18] Defendants also argue that Eve is entitled to qualified immunity because the Sheriff's internal use of force policy governed Eve's taser use and the level of force used was consistent with the Sheriff's general order. Defendants submit expert opinion evidence that the Sheriff's taser

Further, even if a trier of fact could find that Eve appropriately tasered McNally once, no reasonable officer could have believed that he could lawfully deploy a taser multiple times against McNally under the facts McNally asserts.  A trier of fact could conclude that no objectively reasonable officer could believe that, after McNally had been tasered once and was face down on the ground (and thereby effectively subdued), that the officer could deploy the taser a second or third time.  Although Eve had not yet handcuffed McNally when Eve deployed the taser a second time, if all inferences are drawn in McNally's favor, he presented no danger to Eve at that time and there was no risk of flight. (Mitchell Dep. 47:20-23; Thacker Dep. 41:20-23)  Thus, under these facts, Eve's qualified immunity defense fails because his use of the taser three times on McNally was patently disproportionate to the need for force under the totality of the circumstances.[19]

---

policy "is consistent with the recommended guidelines, practices, and procedures of professional law enforcement agencies and their use of force models." (Dkt. 25, Attach. 9 at 7).  This argument is unpersuasive for several reasons.  First, the Sheriff's use of force policy is not in record evidence.  Second, Defendants cite no authority to support the proposition that compliance with an internal policy acts as a complete shield to liability and entitles an officer to qualified immunity.  See generally Moretta v. Miami-Dade County, No. 06-CIV-20467, 2007 WL 701009, *8 (S.D. Fla. Jan. 23, 2007) (observing that officers cannot escape liability for violating an individual's constitutional rights merely because of reliance on a departmental policy).  And finally, because Defendants' expert's opinion largely credits Eve's factual account in determining that Eve's use of the taser was consistent with the Sheriff's policy, the court cannot accept the expert opinion without making a credibility determination in Eve's favor (which is inappropriate at this stage).

[19] Other courts in this circuit addressing whether the use of a taser was reasonably proportionate to the need for force in light of Draper have examined factors such as the severity of the crime, the immediate threat to the officer, the number of times the officer deployed the taser, the injury sustained by the arrestee, and whether the officer warned the arrestee of the potential use of the taser. Compare Magee v. City of Daphne, No. 05-0633-WS-M, 2006 WL 3791971, **9-10 (S.D. Ala. Dec. 20, 2006) (finding qualified immunity where the officers perceived the plaintiff (under arrest for the severe crime of domestic violence) to be argumentative, uncooperative, intoxicated, and having extremely aggravated demeanor; the plaintiff also showed no evidence of injury); Ainsworth, 2006 WL 2709850 at **5-6 (finding qualified immunity where the officers used a taser only once (after issuing two warnings about using the taser) to subdue a violent, unstable, and threatening plaintiff; the officers had patiently tried using lesser force to compel plaintiff to comply

In addition, viewing the evidence in the light most favorable to McNally, the force used

compared to the severity of the crime was hardly de minimus.  In <u>Lee</u>, the Eleventh Circuit noted

that the crime at issue (the improper honking of a car horn in violation of a municipal ordinance)

was "undeniably less significant than the crimes in any of the other cases" where the court had

"granted qualified immunity on the ground that the force used and injury sustained were de

minimus." 284 F.3d at 1199-1200.  McNally's crime of violating the noise ordinance was

undeniably less significant than crimes that other courts in this circuit have addressed in excessive

force cases.  Further, the <u>Lee</u> court explained that "objectively unreasonable force does not become

reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering

more severe physical harm." 284 F.3d at 1200.  Merely because the extent of McNally's injuries

from the taser's effects is unclear "does not alone render the force used de minimus." <u>Id.</u>

Finally, no preexisting case law was necessary "for it to be obvious to every objectively

reasonable officer" in Eve's situation that his conduct violated McNally's right against the use of

---

but to no avail); <u>Dargan v. Hernandez-Vega</u>, No. 6:05-CV-121-ORL-18JGG, 2006 WL 822558, *8 (M.D. Fla. Mar. 24, 2006) (finding qualified immunity because the officers' use of a taser was reasonable where the plaintiff, who did not respond to officers' demands after they threatened to use taser, was not arrested and secured; the one-time tasering, resulting in unsubstantiated injuries, was a marginal use of force under the circumstances); <u>with</u> <u>Stephens</u>, 509 F. Supp. 2d at 1112-13 (denying qualified immunity where the officers tasered an unarmed arrestee four times; the arrestee made no effort to escape and no movement that could be deemed an attack, and the officers used force only because the arrestee was being verbally unruly and refusing to don jail garb); <u>Buckley v. Haddock</u>, No. 5:06cv53-RS, 2007 WL 710169, *1 (N.D. Fla. Mar. 6, 2007) (denying qualified immunity where the officer tasered the plaintiff for refusing to cooperate in his arrest for failing to sign a traffic citation; although the evidence revealed that one application of the taser may arguably have been appropriate, multiple applications of force were unnecessary and grossly disproportionate); <u>Maiorano v. Santiago</u>, No. 6:05-CV-107-ORL-19KRS, 2005 WL 1200882, *8 (M.D. Fla. May 19, 2005) (denying qualified immunity where the officer tasered the plaintiff without advance warning or a verbal command to desist from engaging in a physical altercation with another student).

excessive force. <u>Vinyard</u>, 311 F.3d at 1355; <u>Lee</u>, 284 F.3d at 1199.  As in <u>Lee</u>, the peculiar facts of this case (at least according to McNally) "go so far beyond the hazy border between excessive and acceptable force that [Eve] had to know that he was violating the Constitution even without caselaw on point." <u>Lee</u>, 284 F.3d at 1199 (citation omitted); <u>Vinyard</u>, 311 F.3d at 1355 (citations omitted).  Thus, qualified immunity cannot shield Eve from McNally's excessive force claim and summary judgment is unavailable.

### B.      Liability of the Sheriff

"Respondeat superior imputes to a county sheriff no liability under Section 1983 for injury caused by the sheriff's employees." <u>Greer v. Hillsborough County Sheriff's Office</u>, No. 8:06-CV-213-T-23MSS, 2006 WL 2535050, *3 (M.D. Fla. Aug. 31, 2006) (citing <u>Monell v. Dep't of Soc. Svcs.</u>, 436 U.S. 658, 691 (1978) ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents").  To maintain a claim for unreasonable seizure or excessive force against the Sheriff under Section 1983, McNally must show evidence of a constitutional violation caused by enforcement of a policy or custom of the Sheriff. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004).

A policy is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997).  A custom is "a practice that is so settled and permanent that it takes on the force of law." <u>Id.</u>

### 1.      Unreasonable Seizure

Because Eve had probable cause to arrest McNally for violating the noise ordinance, no constitutional deprivation occurred and the Sheriff incurs no liability as a result of McNally's arrest.

See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  Summary judgment in the Sheriff's favor is therefore proper on McNally's unreasonable seizure claim.

### 2.   Excessive Force

Absent some policy or custom of the Sheriff that caused Eve to use excessive force against McNally, the Sheriff incurs no liability for Eve's use of excessive force (even if unconstitutional). See Monell, 436 U.S. at 694 (holding that a government entity is responsible under Section 1983 only "when execution of a government's policy or custom . . . inflicts the injury"). McNally's claim against the Sheriff for excessive force fails because McNally challenges only the Sheriff's "call clearer" policy but no policy of the Sheriff regulating the use of tasers. The Sheriff's "call clearer policy" is an internal operating procedure that requires deputies responding to noise complaints to obtain personal information and issue written warnings to noise ordinance violators (Dkt. 24, Ex. 1).  Nothing in the policy instructs deputies on the use of force — and more specifically, the use of tasers — in responding to possible noise ordinance violations.

McNally fails to identify any record evidence to demonstrate that the Sheriff's "call clearer" policy for responding to a noise ordinance violation caused Eve to use excessive force against McNally. Thus, the Sheriff is entitled to summary judgment on McNally's excessive force claim.

### C.   Plaintiff's Motion for Summary Judgment

In considering McNally's motion for summary judgment, the court must view the evidence in the light most favorable to Defendants, the non-moving parties.  Fernandez, 906 F.2d at 564 (citations omitted). As discussed above, even under McNally's version of the July 2, 2006 events (McNally's best case scenario), Eve had arguable probable cause to arrest McNally for violating the noise ordinance.  Thus, the court cannot enter judgment in McNally's favor on his unreasonable

seizure claim.  Likewise, the court cannot enter judgment for McNally on his claims against the Sheriff because the undisputed facts demonstrate that no policy or custom of the Sheriff caused McNally's alleged injuries.

As for McNally's excessive force claim against Eve, genuine issues of disputed fact remain to preclude summary judgment.  The parties sharply contest each other's version of the facts preceding Eve's deployment of the taser. The parties differ in their accounts of McNally's conduct during the exchange as well as whether Eve ever told McNally that he was under arrest.  Further, the parties dispute McNally's actions immediately after Eve tasered McNally the first time. Drawing all inferences in Eve's favor, a reasonable jury could find that Eve's use of force was not so egregious as to violate the Fourth Amendment. Thus, the remaining factual issues are more appropriately resolved by the trier of fact and McNally is not entitled to summary judgment.

IV.     **Conclusion**

Accordingly and upon consideration, it is **ORDERED AND ADJUDGED** that:

(1)     Defendant's motion for summary judgment (Dkt. 25) is **GRANTED** as to all claims against Defendant Balkwill; **GRANTED** as to Plaintiff's unreasonable seizure claim against Defendant Eve; and **DENIED** as to Plaintiff's excessive force claim against Defendant Eve.

(2)     Plaintiff's Motion for Summary Judgment (Dkt. 24) is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on this 2nd day of May, 2008.

ELIZABETH A JENKINS
United States Magistrate Judge

23